Date signed August 29, 2012



```
                    _____
                         PAUL MANNES
                    U. S. BANKRUPTCY JUDGE
```

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**Greenbelt Division**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| FIRSTPAY, INC. | : | Case No. 03-30102PM |
| | : | Chapter 7 |
| Debtor | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| MICHAEL G. WOLFF, Trustee | : | |
| Plaintiff | : | |
| v. | : | Adversary No. 05-1695PM |
| | : | |
| UNITED STATES OF AMERICA | : | |
| Defendant | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |

**MEMORANDUM OF DECISION**

This well-traveled[1] adversary proceeding filed June 24, 2005, returns to the bankruptcy court for a brief stop in this court's third attempt at resolution on cross-motions for summary judgment. The matter now before the court is better described as a trial on stipulated facts. By virtue of the parties' comprehensive Stipulation of Facts, the court finds that there are no genuine issues of material fact that need to be resolved, and that the only questions remaining after remand are ones of law.

---

[1] *In re FirstPay, Inc.*, 2010 WL 3199858 (CA4 2010) ; *In re FirstPay, Inc.*, 2008 WL 687027 (BC Md. 2008); *Wolff, Trustee v. United States*, 372 B.R. 244 (D.Md. 2007); *In re FirstPay, Inc.*, 2006 WL 4595780 (BC Md. 2006).

-1-

BACKGROUND

On August 17, 2006, this court dismissed the Complaint following a trial. On appeal, the court's decision was affirmed as to the dismissal of Counts I, III, IV, V, VI, VII and VIII and reversed at to Counts II and IX. An appeal to the Court of Appeals from that decision was dismissed February 8, 2008, by an unopposed motion. Following remand pursuant to the District Court's decision, this court then granted summary judgment in favor of the Trustee on the remaining counts, entering judgment on December 19, 2007, in the sum of $28 million. That judgment was affirmed by the District Court on December 13, 2008. On further appeal, the District Court decision was reversed and remanded by the Court of Appeals. In its decision, the Court of Appeals opined:

> We agree with the Government that the district court erred in finding that it was "undisputed that the transfer of funds from the Debtor to the IRS ... was a transfer of an interest of the Debtor in property" under 11 U.S.C. § 547(b), a threshold requirement for finding a preference. We also conclude that the bankruptcy court abused its discretion in declining to consider the Government's "ordinary course of business" affirmative defense allowed under 11 U.S.C. § 547(c), notwithstanding the Government's failure to plead the defense in its answer to the complaint. Accordingly, we vacate the judgment and remand the case for further proceedings before the bankruptcy court as to the Trustee's preference claim.

The Court of Appeals affirmed the dismissal of the seven other Counts of the Complaint. Thus, only Count II (Avoidance of Preferential Transfers (11 U.S.C. § 547)) and Count IX (Turnover of Avoided Preferential Payments or Fraudulent Conveyance (11 U.S.C. § 550)) remain.

The substance of this case is described by the Court of Appeals as follows:

> FirstPay operated a payroll services business. As a payroll services company, FirstPay prepared and processed its clients' employee payroll checks and in addition, for a significant percentage of its clients, it also calculated, reported, and paid to the IRS on its clients' behalf the associated payroll taxes and withholdings. As to this latter group of clients, FirstPay would generally enter into a so-called Tax Reporting Services Agreement ("TRSA"), which set forth FirstPay's basic duties and some minor operational detail. The TRSA provided in part as follows:
>
>> [1] Client's checking account shall be debited for the aggregate total of all taxes and unemployment insurance due, and credited to FIRSTPAY, Inc. a minimum of three days prior to payroll date. This is in addition to any funds withdrawn for payment of employees. Client agrees to have such funds available at that time.
>> [2] These tax funds will be held by FIRSTPAY, Inc. until such taxes are due, and will be submitted by FIRSTPAY, Inc. in accordance with local,

-2-

state and federal regulations.

[3][sic] Client authorizes FIRSTPAY, Inc. to hold Limited Power of Attorney to sign and send timely all obligations and signed forms to appropriate governments and banks, and [sic, as] required or as requested by FIRSTPAY, Inc.

FirstPay's clients would sign their tax returns and deliver them to FirstPay for filing with the IRS. Client funds representing the gross amount of employee pay, plus the client/employer's shares of withholding and other taxes, were initially credited electronically to a FirstPay bank account, which the parties refer to as the "tax account" or the "tax pay account." With such funds in hand, FirstPay was supposed to remit periodic pay checks to the clients' employees in the net amount of their pay after appropriate withholding and then, by regular wire transfer (perhaps among other methods) pay the taxes due and owing out of the tax account to the appropriate federal, state and local taxing authorities. The Trustee estimated that FirstPay transferred by wire more than $300 million from the tax account to the IRS within the three years preceding FirstPay's bankruptcy, of which $28 million was transferred in the 90 days preceding the filing of the bankruptcy petition.

Sadly for many of FirstPay's clients, not all of the client funds credited to the FirstPay tax account were used for the purposes the clients intended. FirstPay transferred some of the funds to its operating account (using such funds to pay its own business expenses) and it transferred some of the funds into a so-called exchange and reimbursement account, from which FirstPay's principals made lavish personal expenditures in connection with a massive, years-long, fraud scheme. In consequence of this misappropriation of client funds, FirstPay failed to pay over to the IRS a substantial portion (apparently more than $5 million) of its clients' taxes that were due and owing. Seemingly, it is undisputed that during the execution of the scheme, FirstPay would use funds it received from one or more clients to pay the tax obligations of one or more other clients (thus the Trustee's label: "Ponzi Scheme"). In other words, it would use later-acquired client-provided funds to pay earlier-accrued tax obligations of other clients.

The fraud scheme continued undetected for several years at least in part because, although the IRS sent notices of nonpayment to FirstPay's clients, the clients did not receive the notices. The clients did not receive the notices because FirstPay (clearly as part of the fraud scheme) had changed the addresses on the tax returns submitted by FirstPay on behalf of its clients from its clients' addresses to its own address. Thus, the IRS mailed the notices of non-payment to FirstPay (using the altered addresses on the tax returns) rather than to the client/taxpayers.

The fraud scheme unraveled in March 2003 when a FirstPay principal (the architect of the fraud scheme) opened parallel investigations. In due course, investigators executed search and seizure warrants at FirstPay's premises, seizing voluminous records and shutting down its operations. Meanwhile, the IRS undertook to pursue the collection of unpaid taxes from some of FirstPay's clients, many of which were small businesses, professional corporations, and non-profits. It is undisputed that many FirstPay clients that were contacted by the IRS for payment had remitted funds to FirstPay for the purpose of satisfying their tax obligations.

*In re FirstPay, Inc.*, pp. *1-*3, 2010 WL 3199858 (CA4 2010).

DISCUSSION

The material facts underlying this decision are set out in the parties' Stipulation of Facts (D.E. #184), to which is attached as stipulated exhibits a copy of a typical Payroll Processing Agreement and Tax Reporting Services Agreement ("TRSA") used by the Debtor. Inasmuch as the pertinent amendments to the Bankruptcy Code enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 had a general effective date of October 17, 2005, the Code provisions in effect on the date of the filing of the involuntary petition initiating this case on May 16, 2003, govern its resolution. The provisions of law pertinent to this dispute are:

**11 U.S.C. § 541.  Property of the estate**

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

\*          \*          \*          \*          \*

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

**11 U.S.C. § 547.  Preferences**

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

-4-

>    (1) to or for the benefit of a creditor;
>    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>    (3) made while the debtor was insolvent;
>    (4) made—
>        (A) on or within 90 days before the date of the filing of the petition; or
>        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>    (5) that enables such creditor to receive more than such creditor would receive if—
>        (A) the case were a case under chapter 7 of this title;
>        (B) the transfer had not been made; and
>        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
>  *       *       *       *       *
>  (c)  The trustee may not avoid under this section a transfer—
>  *       *       *       *       *
>    (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was —
>        (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>        (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>        (C) made according to ordinary business terms . . . .[2]

In a nutshell, the Court of Appeals' decision requires this court now to determine whether the money that the Debtor paid over to the IRS was property in which the Debtor had the requisite interest under §547(b), and whether the payments fall within the §547(c)(2) exception as having been made in the ordinary course of business.

---

[2] As amended, this subsection now provides in pertinent part:
>    (2)  to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>        (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>        (B) made according to ordinary business terms; . . . .

Interest of the Debtor

In *Begier v. Internal Revenue Service*, 496 U.S. 53 (1990), the Court held that a debtor's payments to the IRS of trust-fund taxes withheld and collected from its employees' wages, even when such payments were made from the debtor's general account, were not transfers of property of the debtor, but instead were transfers of property held in trust for the Government pursuant to 26 U.S.C. § 7501, and therefore not subject to recovery as a preference. The Court reasoned as follows:

> Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property. See, e.g., 11 U.S.C. § 726(b) (1982 ed.); H.R.Rep. No. 95-585, supra, at 177-178. Section 547(b) furthers this policy by permitting a trustee in bankruptcy to avoid certain preferential payments made before the debtor files for bankruptcy. This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy. Of course, if the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated. The reach of § 547(b)'s avoidance power is therefore limited to transfers of "property of the debtor."
>
> The Bankruptcy Code does not define "property of the debtor." Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate -- the property available for distribution to creditors -- "property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. For guidance, then, we must turn to §541, which delineates the scope of "property of the estate" and serves as the post-petition analog to §547(b)'s "property of the debtor."
>
> Section 541(a)(1) provides that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(d) provides: "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . .becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."
>
> <u>Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not "property of the estate." Nor is such an equitable interest "property of the debtor" for purposes of §547(b).</u>

496 U.S. at 58-59 (emphasis added). The Court went on to eliminate any need for the Government to show that the particular funds paid to it were held in trust, despite the fact that

-6-

payments came from the Debtor's general account rather than a segregated tax account:

> As the House Report expressly states, the limitation that the funds must "have been properly held for payment" is satisfied "if the debtor is able to make the payments." The debtor's act of voluntarily paying its trust-fund tax obligation therefore is alone sufficient to establish the required nexus between the "amount" held in trust and the funds paid.
> 
> \*      \*      \*      \*      \*      \*
> 
> We adopt this literal reading. In the absence of any suggestion in the Bankruptcy Code about what tracing rules to apply, we are relegated to the legislative history. The courts are directed to apply "reasonable assumptions" to govern the tracing of funds, and the House Report identifies one such assumption to be that any voluntary prepetition payment of trust-fund taxes out of the debtor's assets is not a transfer of the debtor's property. Nothing in the Bankruptcy Code or its legislative history casts doubt on the reasonableness of that assumption. Other rules might be reasonable, too, but the only evidence we have suggests that Congress preferred this one. We see no reason to disregard that evidence.

496 U.S. at 66-67.

In the present case, in contrast to *Begier*, FirstPay was not holding the subject funds in a statutory trust for the IRS pursuant to 26 U.S.C. § 7501, as the funds were not collected or withheld by FirstPay to meet its own trust-fund tax obligations. That does not end the inquiry, however, as the Court in *Begier* construed § 541(d) as excluding from the estate "property [the debtor] holds in trust for another" without limiting such entrustments to those created by statute. While there is no evidence of an express or contractual trust between the parties, the IRS argues that Debtor held the subject funds in a resulting trust.

Determination of the nature of a debtor's interest in property for purposes of applying § 541(a)(1) is governed by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979); *Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co*., 790 F.2d 1121, 1126 (CA4 1986); *In re Dameron,* 155 F.3d 718, 722 (CA4 1998). While federal law creates the bankruptcy estate, absent a countervailing interest, state law determines whether a given property falls within the purview of property of the estate. *American Bankers Ins. Co. of Florida v. Maness*, 101 F.3d 358, 363 (CA4 1996). The Tax Reporting Services Agreement (the "TRSA") entered into between Debtor and its clients provided that it would be construed according to Maryland law. Maryland law holds that a resulting trust arises from the presumed intention of the parties. *See Sines v. Shipes,* 63 A.2d 748, 755 (Md. 1949); *Siemiesz v. Amend*, 206 A.2d 723, 725 (Md. 1965) ("A resulting trust arises upon the presumed intention of the parties where the terms of the

disposition or accompanying facts establish that beneficial interest is not to go with legal title.")
"A resulting trust arises only when the legal title is in one person and the beneficial interest is wholly or partially in another." *Sands v. Church of Ascension & Prince of Peace*, 30 A.2d 771, 775 (Md. 1943). The doctrine of resulting trusts has been described as follows:

> A resulting trust differs from an express trust in the manner of its creation. It arises when a person makes a disposition of property under circumstances which raise an inference that such person does not intend that the party taking or holding the property should also have the beneficial interest therein, and where the inference is not rebutted and the beneficial interest is not otherwise disposed of.

Restatement (Third) Trusts, §404 (2003). Long ago, the Maryland Court of Appeals laid down the test for determining whether parties, absent an express trust, intended to create a trust in a transaction:

> "Whether or not a trust has been created in any given case is, in the last analysis, a question of intention. No particular words are necessary to create a trust, and trust relations will be implied when it appears that such was the intention. The subject of the deposit being personalty, the trust may be created and proved by parol." *Stone, Administrator, v. National City Bank of Baltimore*, 94 A. 657, 659 (1915). [Citations omitted.]
>
> As the existence of a trust depends upon the intention of the parties, we must consider the evidence in the case in order to ascertain their intention and to determine whether the alleged trust existed.

*Kozlowska v. Napierkowski,* 170 A. 193, 195 (Md. 1934).

In their Stipulation of Facts, the parties state in part:

> 5. Like agreements from other companies that provide similar services, Firstpay's Payroll Processing Agreement and Tax Reporting Services Agreement generally provide that, for a fee, Firstpay would electronically withdraw funds from its Clients' accounts, file required forms with federal and state taxing authorities, and, except for other withholdings and the fees that it was contractually authorized to retain, remit all money that it had collected for its Clients' tax obligations to the tax authorities on behalf of its Client.
> \*    \*    \*    \*    \*
> 7. On behalf of its Clients, Firstpay transferred some of the money that it received from the Clients to the United States to pay certain tax liabilities, identified in ¶¶ 8 and 9, that the Clients owed to the United States ("Tax Payments").
> \*    \*    \*    \*    \*.
> 18. Based upon the information provided by the Client, the Debtor would

-8-

calculate the amount of income tax, employee's share of FICA taxes, and employer's share of FICA taxes that were due for each employee. Debtor would also calculate the Client's liability for FUTA taxes.

19. Firstpay would then total the amount of the taxes, net wages, and contractually agreed fees that should be transferred to Firstpay pursuant to the Payroll Processing Agreement and Tax Reporting Services Agreement (the "Authorized Amount").

\* \* \* \* \*

23. The electronically transmitted Authorized Amounts were deposited into the account the Debtor referred to as the "tax account" (the "Tax Account").

\* \* \* \* \*

26. Once the Authorized Amounts were in the Tax Account, the Debtor transferred the funds out of the Tax Account.

27. Firstpay electronically transmitted some of the money that it received as Authorized Amounts to the United States to cover a portion of the Clients' Tax Payments.

28. Although the Debtor had calculated the amounts of tax that were due from each Client, and although the Debtor withdrew sufficient funds from its Clients' accounts to cover the Debtor's fees and to pay the respective Clients' tax obligations in full, the Debtor did not transfer all of the funds to the United States that it was contractually obligated to transfer under the Payroll Processing Agreement and the Tax Reporting Services Agreement.

\* \* \* \* \*

34. In addition to the Tax Account, Firstpay maintained an "operating account" (the "Operating Account") to pay its own employee payroll, rent, and similar legitimate business expenses.

35. In addition to the Tax Payments, Firstpay transferred some of the money in the Tax Account from the Tax Account to the Operating Account.

36. The balance of the money in the Tax Account was transferred to a third account called the "reimbursement account" or the "exchange and reimbursement account" (the "Reimbursement Account").

In addition, the TRSA - under the heading, "FIRSTPAY, INC. PAYROLL RESPONSIBILITIES" - provides that, ". . . FIRSTPAY, INC. <u>will serve as a limited agent for Client only for the purposes of any required agency for deposits and filing with the Internal Revenue Service</u>, and/or any state reporting agency." (Emphasis added.)

Based on the foregoing stipulations and agreements, the court finds that Debtor was, as described in *In re Lan Tamers, Inc*., 329 F.3d 204, 210, 215 (CA1 2003), only a delivery vehicle for the payments it made to the IRS, lacking any equitable interest in the funds entrusted to it with which the payments were made. The court concludes that the basis for imposing a resulting trust in this case on the funds received by the Debtor from its clients is beyond dispute under

Maryland law as applied to the stipulated facts. Debtor was an agent with sharply defined responsibilities, and was intended to have utterly no discretion as to the application of the funds. Its express task on behalf of its clients was to calculate the sums due the governmental agencies and transmit the funds thereto. While nothing in the applicable documents expressly mentions that the Debtor was to hold the withdrawn client funds in trust, under the attendant circumstances the intention to create a trust as to the funds is irrefutable. As such, said funds were not "property of the debtor" for purposes of § 547(b). *Begier*, 496 U.S. at 59.

To the extent that some of the payments came from client funds that Debtor had transferred into and commingled in its non-tax accounts, there is no necessity that said funds be traceable in order to be deemed as held in trust. *Begier* at 67 ("The courts are directed to apply 'reasonable assumptions' to govern the tracing of funds, and the House Report identifies one such assumption to be that any voluntary prepetition payment of trust-fund taxes out of the debtor's assets is not a transfer of the debtor's property.") The court sees no reason to limit *Begier's* holding on this issue to funds held pursuant to a statutory trust as opposed to the resulting trust found herein. Moreover, it is generally recognized that a thief-agent does not take title to funds he steals. *In re Newpower*, 233 F.3d 922, 933 (CA6 2000).

The imposition of a resulting trust in this case gives effect to the manifest intention of the parties. Funds in the Debtor's possession that it was intended to hold in trust are not property in which the Debtor had an equitable interest, and the transfer of these funds cannot be a preference.

Ordinary Course Exception

While the court concludes that the subject payments are not avoidable as preferences, the court will address the ordinary course exception of § 547(c)(2) as directed by the Court of Appeals. In this analysis, the legislative history behind BAPCPA § 409 that amended 11 U.S.C. § 547(c)(2), is instructive:

> [S]ection 547(c)(2) of the Bankruptcy Code [is amended] to provide that a trustee may not avoid a transfer to the extent such transfer was in payment of a debt incurred by the debtor in the ordinary course of the business or financial affairs of the debtor and the transferee and such transfer was made either: (1) in the ordinary course of the debtor's and the transferee's business or financial affairs; or (2) in accordance with ordinary business terms. Present law requires the recipient of a preferential transfer to establish both of these grounds in order to sustain a defense to a preferential transfer proceeding.

-10-

Vol. E–2, Collier on Bankruptcy App. Pt. 10(b) at App. Pt. 10–355 (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2012).  "The legislative history emphasizes that 'or' is to be read in the disjunctive but otherwise imparts no insight as to how the reconstructed statute should be interpreted."  *Ibid.*  Under 11 U.S.C. §5 47(g), the IRS has the burden of proof as to this defense and must satisfy each of § 547(c)'s three subsections.  *See Advo-System, Inc. v. Maxway, Inc.,* 37 F.3d 1044, 1047 (CA4 1994).  In its analysis, the court is guided by the rule adopted by the Fourth Circuit in *Advo-System, Inc.*:

> In summary, we hold that subsection C requires an objective analysis and we adopt the Seventh Circuit's *Tolona Pizza* rule modified and embellished by the Third Circuit in *Molded Accoustical*:
>> [W]e read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.
>
> *Molded Accoustical*, 18 F.3d at 226.  But subsection C never tolerates a gross departure from the industry norm, not even when the parties have had an established and steady relationship.

*Advo-System, Inc.,* 37 F.3d at 1050.

Use of the ordinary course exception in this case is like trying to fit the proverbial square peg into a round hole.  As described in the legislative history to the Bankruptcy Reform Act of 1978, "[t]he purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy ."  HR Rep. No. 595, 95th Cong. 1st Sess. 373 (1977).  This case is similar to those of transfers by debtors engaged in Ponzi schemes that do not, as a matter of law, involve ordinary business terms.  *Cf. Henderson v. Buchanan,* 985 F.2d 1021, 1025 (CA9 1993).  "A debt cannot be incurred in the ordinary course of business, where the debtor engaged in fraudulent conduct*." In re Computer World Solution, Inc.*, 427 B.R. 680, 690 (B.C. ND Ill. 2010).  In *Computer World Solution*, that court went on to

say:

> This court notes that the [§547(c)(2)] exception to preference liability applies to payments made by a legitimate business, not payments made by a fraudulent business. The measure of business conduct for purposes of this defense should be limited to the legitimate practices of legitimate businesses. This court declines to apply the Defendants' reasoning; ordinary businesses do not pay fictitious profits or systematically defraud their customers or their lenders.

427 B.R. at 693.  *But see In re Independent Clearing House Company,* 77 B.R. 843, 874-875 (D. Utah 1987) (ordinary course exception not necessarily precluded as to payments received by investors in the course of debtor's Ponzi scheme)*; accord, In re Financial Partners, Ltd.*, 116 B.R. 629, 636-638 (BC N.D. Ill. 1989).

Payments made by this debtor to the IRS on an inconsistent basis as to whose funds were being paid over and the amounts that should have been paid over cannot be viewed as having been made according to industry standards.  The fact that it became the ordinary course of the Debtor's affairs to misappropriate its clients' funds would not bring activities associated with that action into the safe harbor of 11 U.S.C. § 547(c)(2) for the IRS.  Accordingly, if the court were to find that the subject payments were preferences, the payments would not be protected from avoidance under the ordinary course exception.

CONCLUSION

The Trustee inherited a miserable situation in this case where Debtor's clients, who had done nothing wrong, faced what amounted to double-payment of trust fund and other taxes because of Debtor's defalcation.  All they could do under the circumstances was to file claims against what may turn out to be an administratively insolvent estate.  In an effort to accomplish substantial justice, the Trustee filed this nine-count complaint.  The heart of the complaint was Count I, seeking a Declaratory Judgment under 28 U.S.C. §§ 2201-2202.  Because the IRS allowed the Debtor to change its clients' addresses such that the clients never received notice of the defalcation, Debtor was enabled by the IRS to perpetrate and perpetuate its fraudulent scheme.  As the Trustee lacked standing to seek this relief, having no personal stake in the outcome of the controversy, the court had to dismiss this Count.  *Warth v. Seldin*, 422 U.S. 95, 98 (1975); *Bishop v. Bartlett,* 575 F.3d 419, 423-424 (CA4 2009).  Faced with an apparent lack of assets from which he could pay any substantial dividend on the more than $6 million in claims filed in this case

(most of which were those of Debtor's defrauded clients), the Trustee's actions were laudable in all respects. The lack of success does not reflect on the quality of his work or his well-intentioned efforts. He and his counsel acted in the best tradition of the bar in an effort to help entities that had done nothing wrong and faced terrible consequences as a result of innocently employing a crook. This was a case where the services rendered were appropriately rendered. Had the Trustee been successful, this would have represented a 100% dividend for the creditors.

   An order will be entered in accordance with the foregoing.

cc: Plaintiff's Counsel
   Defendant's Counsel
   United States Trustee

**END OF MEMORANDUM OF DECISION**